## CATCHINGS V. HARCROW.

1. PRACTICE: *Transfer of cause.*

    Courts of equity and of law have jurisdiction to relieve against frauds upon creditors. And where no motion is made to correct an error in the adoption of the proceedings, the court may either transfer the cause of its own motion, or proceed to trial on the merits.

2. FRAUDULENT SALE: *Innocent purchaser.*

    A purchaser of property sold by a debtor to defraud his creditors will not be affected by the fraud unless he participated in it.

3. PRACTICE: *Setting aside irregular sale under execution.*

    Where a judgment creditor purchases property sold under execution for satisfaction of the judgment, finds that the sale was irregular, he may go into chancery to have the sale set aside, and for a resale of the property.

APPEAL from *Drew* Circuit Court, in Chancery.

J. M. BRADLEY, Judge.

*McCain & Crawford* for appellant.

1. The act (*Mansf. Digest, secs. 4125–6*) providing for levying attachments from justices' courts on land was held constitutional in *Rush v. Visart, 42 Ark.*

2. Even if appellant's remedy was at law, it was error to dismiss the bill; but the cause should have been transferred to the proper docket. *Mansf. Dig., secs. 4925–9.* And if no motion is made to transfer, and no objection is made, the court should try the case on its merits. *31 Ark., 411; 32 id., 56; R. R. v. Perry, 37 Ark.; Conger v. Cotton, 37 id., 286.* Both courts of law and equity have jurisdiction to set aside deeds for fraud. *24 Ark., 222; 14 id., 79; id., 79; 12 Peters, 11; 10 Ark., 53.* As to appellant's right to sue in equity, see *33 Ark., 328, 762.*

3. Review the facts, and contend that the deed to Elbert was fraudulent and void as to creditors.

SMITH, J.  J. C. Harcrow opened a mercantile business in the town of Monticello in the spring of 1880.  In August and the fall of the same year he bought goods in Memphis, Louisville and St. Louis, to the amount of several thousand dollars, upon a credit.  These goods he sold for cash, chiefly in large lots, to other merchants in the same town, and at prices corresponding to the original cost.  He paid no debts, and in January, 1881, when he had sold out his stock, had no property in sight, having shortly before sold and conveyed his iron safe, and the house and lot in which he carried on business, to his brother Elbert, for an alleged debt due him.

Catchings & Co., one of his creditors, sued J. C. Harcrow before a justice of the peace, and swore out an attachment, which was levied upon the safe, and also upon the house and lot.  The attachment was sustained, and the attached property was condemned to be sold.  Elbert brought an action of replevin against the purchasers of the safe; but after a contest before the justice, which was fought over again in the Circuit Court, he was finally defeated.  The proceeds of the sale of the safe being insufficient to satisfy their debt, Catchings & Co. filed a transcript of their judgment in the office of the Clerk of the Circuit Court, and upon execution issued thereon purchased the real estate which had been attached for the residue of their debt, $180.30.  This sale was made for cash, contrary to the statute, and the same not being redeemed within the time prescribed by law, the Sheriff conveyed the premises to them by deed.  Entertaining some doubt as to the validity of the sale, and no one being in actual possession, Catchings & Co. now exhibited their bill, assailing the previous conveyance to Elbert Harcrow as a fraudulent contrivance to defeat the creditors of J. C. Harcrow, and alleging that the demand, in satisfaction of which it purported to have been made, was simulated.  The two brothers filed a joint answer, claiming that the debt of J. C. to Elbert was just and honest, and that

the whole transaction amounted only to a preference of one creditor over another. Proofs were taken, and at the hearing the bill was dismissed.

It is suggested in the brief for appellants that the ground of dismissal was the supposed unconstitutionality of the act of January 23, 1875, allowing attachments issued by a justice of the peace to be levied upon lands. *Mansf. Dig.*, *sec. 4125, et seq.* But this question was set at rest in *Bush v. Visart, 40 Ark., 124.* However, the decree will not be disturbed, if it can be sustained on any ground. It may also have been thought that the plaintiffs, having proceeded to a sale and having obtained the Sheriff's deed, their rights were purely legal, and their remedy an action of ejectment. But an error of this sort was no good cause for dismissal, but only for a transfer of the cause to the proper docket. *Mansf. Dig., 4925, et seq.; Talbot v. Wilkins, 31 Ark., 411; Moss v. Adams, 32 id., 562; L. R. & Ft. S. R. Co. v. Perry, 37 id., 164; Conger v. Cotton, id., 286.*

**1. PRACTICE:** Courts of equity and of law have jurisdiction to relieve
**Transfer of cause.** against frauds upon creditors. And where no motion is made to correct an error in the adoption of the proceedings, the court may either transfer upon its own motion, or may proceed to a trial upon the merits.

**2. FRAUDULENT SALE:** The testimony leaves no room to doubt that the pretended
**Innocent purchaser.** failure in business of J. C. Harcrow, and everything connected therewith, including the disposal of his property, was a deliberate scheme to avoid the payment of his debts. This, however, would not affect Elbert Harcrow, unless he was privy to the design, or assisted in its execution; in other words, unless he participated in the fraud. *Christian v. Greenwood, 23 Ark., 258.*

The brothers were unmarried men, occupying the same apartment in the store where the business was conducted. They had been previously associated in business, sometimes as partners and sometimes as employer and clerk. Elbert was now

sole clerk to J. C., and probably as well acquainted with the details of the business as J. C. himself. They sold their goods for cash, keeping few or no books of account. Elbert was aware that J. C. had purchased his stock of goods in the fall of 1880 on a credit, and that the same had never been paid for. He claimed, however, that he had $1300 of his own money when he came to Monticello, which he deposited in the safe, and which J. C. used in the course of his business, and that the deed was received in payment of $1000, part of said sum. In the replevin suit for the safe he had given a different account of the origin of this debt. He had then sworn that he had lent J. C. $1000 in the summer of 1879, before he ever came to Monticello. And one of his witnesses in that suit—another brother—had stated that the debt had originated in 1878, when the witness and Elbert had sold their mercantile business to J. C., and J. C. made his note for $1000 in payment of Elbert's share.

The deed was executed on the 12th of November, 1880. One suspicious circumstance was that it was prepared, executed and acknowledged outside of the grantor's own county. On the 19th of November, 1880, J. C. Harcrow had occasion to justify as surety on a bond. He then swore that he was worth $2600 over and above his debts, liabilities and exemptions. When questioned as to what his property consisted of, he mentioned the house and lot in controversy, which he valued at $1000, and his stock of goods, which he valued at $5000, but upon which he owed $2500. The deed to Elbert was not then upon record; nor was it filed for that purpose until January 6, 1881—about the time of J. C.'s suspension.

Elbert had then offered to compromise with J. C.'s creditor's at twenty cents on the dollar, and had settled one small claim on that basis. After this the brothers retired to an adjoining county, where Elbert set up in business for himself, and J. C. in turn became his clerk.

Our conclusion is that the indebtedness of J. C. to Elbert Harcrow was a sham, and that, in taking the conveyance, he was merely assisting his brother to put his property beyond the reach of his creditors. It cannot, therefore, be permitted to stand against complaining creditors. The plaintiffs have offered to submit to a resale in consideration that the property was irregularly sold for cash, and at a price greatly below its value.

8. PRACTICE: Irregular sale. The decree below is reversed and cause remanded with directions, unless the defendants, or one of them, shall immediately pay to the plaintiffs their debt, interest and costs, together with taxes, if they have paid any, to enter a decree setting aside the deed of J. C. Harcrow to Elbert Harcrow as fraudulent against the plaintiffs; also, to cancel the Sheriff's deed to the plaintiffs for the same property, and to order another sale to be conducted by a commissioner appointed for that purpose, and for further proceedings.